

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

---

**NO. 2-06-376-CV**

---

RAYMOND GLENN HANCOCK                    APPELLANT

V.

VICKI B. HANCOCK                              APPELLEE

------------

FROM THE 233RD DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

Appellee Vicki B. Hancock filed for divorce in August 2004, and after more than two years of litigation, the trial court granted the divorce and signed the divorce decree. Appellant Raymond Glenn Hancock filed a timely notice of appeal. In eight issues, Glenn complains of the trial court's property division. Because we hold that the trial court did not abuse its discretion in dividing the

---

[1] See TEX. R. APP. P. 47.4.

community estate, we affirm the trial court's judgment.

**I.      Findings of Fact and Conclusions of Law**

After two days of trial, the trial court found:

. . . .

6.      Credible evidence was admitted to support the following factors for consideration by the Court in ordering a division of the parties' estate:

   a.      GLENN's[2] fault in the breakup of the marriage;

   b.      fraud on the community committed by GLENN;

   c.      benefits VICKI may have derived from the continuation of the marriage;

   d.      disparity of earning power of GLENN and VICKI and their ability to support themselves;

   e.      earning power, business opportunities, capacities, and abilities of both spouses; and

   f.      wasting of community assets by GLENN.

7.      The community property of the parties existing and remaining to be divided as of the date of the trial was valued as follows:

   a.      Property with an ascertainable cash value:

---

[2] The trial court referred to the parties by their full names or initials in the findings of fact and conclusions of law.  In quoted excerpts from the findings of fact and conclusions of law, we have modified these references by using only the given names of the parties.

2

. . .

  Hancock Ins. Agency, Inc.  $170,520.00

. . .

. . . .

8. The total value of the community estate existing on the day of trial was $1,727,842.89.

. . . .

14. GLENN committed fraud on the community and waste of community assets during the pendency of the divorce proceeding by improperly disposing of certain community property.

15. Except for the fraud on the community and waste committed by GLENN, the community property of the parties remaining to be divided would have included the following additional cash assets:

| | |
|---|---|
| Hancock Insurance Agency, Inc. funds expended solely to benefit GLENN | $171,971.71 |
| Retirement funds withdrawn and expended solely to benefit GLENN | $121,334.70 |
| Cash from Ranch[3] | $36,000.00 |
| **Total** | **$329,306.41** |

. . . .

---

[3] A footnote here provided, "Cash GLENN advised Judge Haddock (Associate Judge of 233rd Judicial District Court) GLENN had 'at the ranch'; Judge Haddock ordered the cash be deposited in HIA account; instead [he] withdrew $36,000 out of First State Bank account and deposited in HIA[.]"

17. Therefore, in making a just and right equitable division of the community estate, the Court considered the total value of the community estate to be $2,105,549.30 ($1,727,842.89 + $329,306.41 + $48,400.00 [cash advances the parties received from the receiver before trial]).

. . . .

19. VICKI was awarded [$1,227,178.06 in] existing community property[.]

20. VICKI received $26,600.00 in cash advances of community property . . . .

21. VICKI thus received $1,253,778.06 of the total community estate considered by the Court ($1,227,178.06 + $26,600.00).

22. The percentage of existing community property awarded to VICKI was 71% ($1,227,178.06/$1,727,842.89)[.] The percentage of the total value of the community estate considered by the Court as awarded to VICKI was 59.5% ($1,253,778.06/$2,105,549.30).

. . . .

24. GLENN was awarded [$500,664.83 in] existing community property[.]

25. GLENN received $22,000.00 in cash advances of community property. . . .

26. Due to the fraud on the community and waste committed by GLENN, the Court considered that GLENN also received [$329,306.41 in] advances of community property[.]

27. GLENN thus received $851,971.24 of the total community estate considered by the Court ($500,664.83 + $22,000.00 + $329,306.41).

4

28. The percentage of existing community property awarded to GLENN was 29% ($500,664.83/1,727,842.89)[.] The percentage of the total value of the community estate considered by the Court as awarded to GLENN was 40.5% ($851,971.24/2,105,549.30).

The trial court's conclusions of law included the following:

. . . .

2. The parties should be divorced on the ground that the marriage had become insupportable because of discord or conflict of personalities.

. . . .

4. In determining the total value of the community estate to be considered by the Court in making a just and right equitable division of the community estate, the Court should recoup the amount of community property lost to waste and/or constructive fraud committed by GLENN.

5. The value of the community property lost to waste and/or constructive fraud committed by GLENN should be considered as part of the total value of property awarded to GLENN.

## II.   Preliminary Matter:  Glenn's Notebook

Initially, we note that in presenting his issues, Glenn relies on information found in Respondent's Exhibit One, "Glenn Hancock's Submission Notebook." Vicki contends that the notebook was admitted as a summary of the witness's testimony and that its contents cannot be considered as admissible evidence. Rule 105(a) of the Texas Rules of Evidence provides that "[w]hen evidence

5

which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope."[4] Evidence admitted for a limited purpose may be considered for only that purpose.[5]

Our review of the record shows that the notebook was offered when the couple's adult son, Brad Hancock, was on the witness stand, after he had been sworn but before he testified. When asked if he had any objections to the admission of the notebook, Vicki's lawyer replied,

> Your Honor, in the conference that we had at the bench a few minutes ago, I'm afraid this — and I don't anticipate there are,

---

[4] TEX. R. EVID. 105(a).

[5] *See Davis v. Gale*, 160 Tex. 309, 330 S.W.2d 610, 612–13 (Tex. 1960) (holding that trustee's deed that plaintiffs introduced for limited purpose of demonstrating a cloud on their title could not be used as proof of defendant's title); *Tex. Commerce Bank Reagan v. Lebco Constructors, Inc.*, 865 S.W.2d 68, 76 (Tex. App.—Corpus Christi 1993, writ denied) (holding evidence admitted for particular purpose may not be weighed in determining sufficiency of evidence to show matter outside limitation), *overruled on other grounds by Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 530 (Tex. 1998); *Fitzgerald v. LaFreniere*, 658 S.W.2d 692, 696 (Tex. App.—Corpus Christi 1983) (holding document offered for limited purpose of showing it had been given to party and never re-offered remained subject to limited tender and was no evidence of other fact sought to be proved), *rev'd on other grounds,* 669 S.W.2d 117 (Tex. 1984); *see also Peaster Indep. Sch. Dist. v. Glodfelty*, 63 S.W.3d 1, 10 (Tex. App.—Fort Worth 2001, no pet.) ("[E]vidence specifically offered only for a limited purpose remains subject to its limited purpose; consequently, such evidence is simply not probative evidence of any other fact.").

but if there is any settlement negotiations in here, I would object to that. And if this is being offered as a summary of Mr. Hancock's testimony, I don't have any objections so long as it's restricted to a summary —

The trial court replied, "Admitted as a summary of the witness' testimony."

Glenn's attorney referred to the notebook while questioning Brad. Glenn did not testify at trial. Accordingly, because the trial court admitted the notebook only as a summary of the witness's testimony, and the only Mr. Hancock who testified was Brad, we exclude the notebook from our review of the evidence and exclude Glenn's arguments based on the notebook from our analysis. Of course, to the extent that any specific portion of the notebook was admitted into evidence without limitation elsewhere during the trial, we will consider such portion.

## III.    Standard of Review:  Division of a Community Estate

As this court has previously explained,

In a divorce proceeding, the trial court is charged with dividing the community estate in a "just and right" manner, considering the rights of both parties. Trial courts are afforded wide discretion in dividing marital property upon divorce; therefore, a trial court's property division may not be disturbed on appeal unless the complaining party demonstrates from evidence in the record that the division was so unjust and unfair as to constitute an abuse of discretion.

To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, we must decide whether

7

the act was arbitrary or unreasonable. We must indulge every reasonable presumption in favor of the trial court's proper exercise of discretion in dividing marital property. Accordingly, we will reverse only if the record demonstrates that the trial court clearly abused its discretion, and the error materially affected the just and right division of the community estate.

. . . In exercising its discretion, the trial court must order an equitable, but not necessarily equal, division of the community estate. In dividing the estate, the trial court can consider a variety of factors, and it is presumed that the trial court exercised its discretion properly.[6]

## IV. The Trial Court's Division of the Hancocks' Community Estate

In his first issue, Glenn contends that the trial court made an unjust division of the marital estate.

### A. No Waste by Vicki

In his seventh issue, Glenn contends that the trial court failed to take into account money wasted by Vicki in making a just and right division of the marital estate. Our review of the admitted evidence reveals that Brad testified that he had seen "over 10 or 20" bundles of $100 bills before "Y2K hit" in the parties' Crest Lake home, that he did not recall when he last saw the money but it was at some point before he was ordered to move in with his father in 2004, and that when he last knew who had possession of the money, the person in

---

[6] *Schaban-Maurer v. Maurer-Schaban*, 238 S.W.3d 815, 820 (Tex. App.—Fort Worth 2007, no pet.) (citations omitted).

8

possession was Vicki. Glenn does not refer to any other admitted evidence. The factfinder is the sole judge of credibility of the witnesses.[7] As factfinder, the trial court was in a better position to determine the candor, demeanor, and credibility of the witnesses.[8] We cannot say that the trial court abused its discretion by implicitly finding that Vicki did not waste any of the community estate. We overrule Glenn's seventh issue.

**B.     Value of Hancock Insurance Agency**

In his eighth issue, Glenn contends that the trial court erred by valuing Hancock Insurance Agency at $170,520.00 when there was no evidence or factually insufficient evidence to support that finding. Bryan Rice, whom the trial court appointed to evaluate the insurance agency, testified on the first day of trial that his opinion as of that date, July 17, 2006, was that the value of the insurance agency was approximately $204,000.00 subject to a possible judgment of about $80,000.00. He also testified that the projected renewals of policies from August 1 through the end of the year was about $3.4 million in gross premiums for the rest of the year. He estimated that ten percent of those renewal dollars, or $340,000.00, would be the approximate agency

---

[7] *Id.* at 821–22.

[8] *Id.*

9

revenue for the remainder of the year. He testified that he used that percentage rate because it was historical and that on average the rate ranged from 8 to 12 percent. He also testified that in constructing a current balance sheet for the agency, he considered "cash, a check that's receivable from the IRS, [and] a small assessment for furniture and supplies," and then he "subtracted from the total assets of [$]442,000 the liabilities of about $170,000.00 to get to an unadjusted book value of about [$]272,000," and then he "assessed a 25 percent discount for lack of marketability of the agency," reaching a net value of $204,099.00.

More than five weeks later, on the second day of trial, August 24, 2006, Bryan Rice identified Petitioner's Exhibit 9S2 as "a two-page document wherein [he] brought forward . . . the valuation of the agency and more current numbers[,] taking into account more updated facts and circumstances." The document summarizes his opinion as to the agency's value as of that date, August 24, 2006. The first page of the exhibit provides a computation ending in $170,520.00, labeled as "**Adjusted Value?**" Rice explained how he arrived at the value,

> I summed the assets of the agency and future — or income to be earned in the next — through the end of this year and then deducted future expenses and liabilities to arrive at a net asset value. I subtracted a 25 percent discount for lack of marketability on the net assets and came to a net value of the agency. And I

10

also provided a — I'd say a hypothetical calculation taking into account whether or not the contingent liability or the liability related to the . . . building that . . . the Hancock Insurance Agency vacated — there is . . . apparently, a judgment against the corporation for unpaid rents, and there's a question in my mind as to whether that amount is actually going to ever be paid, so I provided the Court a scenario if it's going to be paid or if it's not going to be paid.

. . . .

. . . . I would be the one to have made the payment because I'm the Receiver for the corporation, and I've not been served with any type of document ordering me to pay the judgment. I've not received any direction from any attorney or court to pay the judgment.

Rice also explained that he considered future commissions in valuing the

business

[b]ecause they . . . represent likely benefits to be earned by this . . . business in the very near future, within the next four months or — so[. T]hese commissions have a very lengthy history of being earned year after year. As . . . I stated, there's no guarantee that these commissions will be earned, but I would say it's probable that they will be earned.

He also testified that the 25% discount is a higher than normal discount for a

controlling interest, in his opinion.

On cross-examination, Rice admitted that there was no buyer for the

agency at the time and that he had not been approached by a potential buyer

during his term of receivership, which had lasted about eighteen months.

Vicki testified that she believed that Glenn had taken actions to diminish

11

the value of the agency and had diverted business from the agency. As evidence, she pointed to the fact that Glenn had transferred their personal homeowners' insurance and auto insurance policies from the agency without her knowledge. She received a letter after the fact from the insurance company stating that the agent of record (Glenn) had been changed to another agency. She also testified that Glenn had, during the pendency of the divorce, set up two other companies, Hancock Insurance & Associates and National Healthcare Insurance Resources, to which he had diverted $300–$400,000.00, receiving proceeds under a different business name that the trial court had ordered the receiver to receive. She testified that she thought that this action also contributed to the decline or the demise of the agency. Further, she testified that in her opinion, if Glenn had been doing all he could to improve the value of the agency, it would be worth more than $204,000.00, and that prior to the divorce, they had been offered 1.5 times the "book" of business for the company. At the time she testified, that measure would have made the agency worth about $600,000.00.

Glenn's expert, Robert Martin, testified that the agency had approximately twelve large accounts before receivership but only one as of the first day of trial and that the diminution in value of the business since it had entered into receivership was indicative of Glenn's importance to the business.

12

Glenn contends that Rice's report is based on an incorrect assumption that the agency will have a 100% renewal rate. The evidence shows that Rice considered the longevity of the accounts for which he projected renewals, the short term that would elapse before the revenue would start rolling in, and the possibility that the customers would not renew. This possibility also appears woven into the higher-than-usual 25% discount rate. Glenn's reliance on the lost profits analysis in *Szczepanik v. First Southern Trust Co.*[9] in arguing that there is no evidence as a matter of law of the agency's value is therefore misplaced.

Glenn also complains that Rice failed to reduce the agency's value by a liquidated judgment of $61,387.00. Rice explained why he did not include that amount in his estimated value of the company but also noted the amount on the report and his alternate estimate behind it.

Glenn additionally contends that Rice did not render an opinion that the value was $170,520.00 but rather questioned whether that amount was the value. Rice testified that the exhibit summarizes his opinion as to the agency's value as of that date, August 24, 2006. The first page of the exhibit, which provides an estimate of the value ignoring the alleged judgment against the

---

[9] 883 S.W.2d 648, 650 (Tex. 1994).

13

company, provides a computation ending in $170,520.00, labeled as **"Adjusted Value?"**.  We conclude that the evidence easily lends itself to a conclusion that Rice opined that the estimated value of the company on August 24, 2006 was $170,520.00.

Finally, Glenn argues that the anticipated renewals should not have been included in the value at all because they would not be earned or received until after the divorce and thus were not themselves community property.  Because the business was the community asset being valued, not the individual renewals, we cannot say that Rice improperly considered the anticipated revenue in valuing the agency or that the trial court abused its discretion by including the amount in its valuation of the agency.

As the factfinder, the trial court was the sole judge of the credibility of witnesses and the weight to be given to their testimony[10] and could resolve any inconsistencies in the evidence.[11]  Based on the above discussion, we hold that the trial court did not abuse its discretion by valuing the insurance agency at $170,520.00.  We overrule Glenn's eighth issue.

**C.    Fraud on the Community and Waste Supported by Evidence**

---

[10] *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

[11] *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986).

14

Apparently as subissues to his global issue contending that the trial court abused its discretion in dividing the community estate, Glenn contends that the evidence is legally and factually insufficient to support the trial court's findings that he committed fraud on the community and wasted community assets.

As this court has previously explained,

> The Texas Supreme Court has recognized waste of community assets as a factor to be taken into consideration in the division of the community estate. . . .
>
> . . . . A fiduciary duty exists between a husband and a wife regarding the community property controlled by each spouse. "Fraud on the community" is a judicially created concept based on the theory of constructive fraud and is applied when there is a breach of a legal or equitable duty, which violates this fiduciary relationship existing between spouses. Although not actually fraudulent, any such conduct in the marital relationship is termed fraud on the community because it has all the consequences and legal effects of actual fraud since the conduct tends to deceive the other spouse or violates marital confidences.
>
> A presumption of constructive fraud arises where one spouse breaches the fiduciary duty owed to the other spouse and disposes of the other spouse's one-half interest in community property without the other's knowledge or consent. When that occurs, the burden of proof is on the disposing spouse to show fairness in disposing of community assets.[12]

Waste of community assets occurs when a spouse wrongfully depletes the

---

[12] *Loaiza v. Loaiza*, 130 S.W.3d 894, 900–01 (Tex. App.—Fort Worth 2004, no pet.) (citations omitted).

community's assets without the other spouse's knowledge or consent.[13]

The trial court found that Glenn had committed fraud on the community and had wasted community assets by improperly disposing of certain community property during the pendency of the divorce. Specifically, the trial court found that Glenn had expended $171,971.71 of Hancock Insurance Agency, Inc. funds and $121,334.70 of retirement funds for his sole benefit. Glenn had also disobeyed the trial court's order to deposit $36,000.00, cash on hand "at the ranch," into the insurance agency account. The trial court found that, but for Glenn's fraud on the community and waste, the community estate would have been larger by $329,306.41.

### 1. The $171,971.71 in Insurance Agency Funds

Glenn contends that Vicki offered no evidence why the $171,971.71 in the insurance agency's funds that the trial court found were expended solely to benefit Glenn were a waste or fraud on the community. Vicki testified that Glenn paid himself the $171,971.71 from the insurance agency without the trial court's approval while there were temporary orders in place "that said how much money" each spouse was to receive. She answered affirmatively when asked indirectly whether she "felt [those] were benefits that [Glenn] received

---

[13] *Schlueter v. Schlueter*, 975 S.W.2d 584, 589 (Tex. 1998).

16

that [she] didn't receive equal benefit from" and indicated that he was not authorized by the trial court to make them and that she objected to them.

The accountant for the agency, Walter Virden, testified that the Hancocks had paid bills out of the insurance agency that would generally get reclassified as shareholder distributions; that he had had to make those kinds of adjustments "pretty much the entire time"—twenty-five years—that he had been representing them; that in the past, even before the divorce, ranch expenses had been paid out of the agency; and that Vicki's numbers did not account for any deposits that Glenn or Vicki might have made into the agency. When asked if he "notice[d] anything unusual or anything that would suggest that Glenn . . . ha[d] personally benefitted from" the agency funds, Virden answered, "Well, there's a — no, because here I can't tell — like — well, there's a Dish Net — Dish Network (sic) for $35.25. I don't know what that would be for." He answered, "Perhaps, " when asked whether Glenn had "probably personally benefit[t]ed" from that. On cross-examination, Virden stated that he did not know "whether [Glenn] did or . . . did not receive personal benefit" from the funds.

Virden testified,

The explanation for those items would have been in the books of the company under various expense categories. And, also, there were items of credits where money was paid back to the

17

corporation either from Hancock Insurance or from Mr. Hancock or Mrs. Hancock . . . [,] and those credits are not reflected in these numbers.

He also testified that a total of $114,000.00 in deposits had been made that were not reflected in Vicki's numbers.

The burden was not on Vicki to justify the expenditures. Because Vicki put on evidence that the money was spent without her consent, it became Glenn's burden to show that the $171, 971.71 was expended fairly.[14] Further, the trial court as the factfinder was the sole judge of the credibility of the witnesses and the weight to be given to their testimony[15] and could resolve any inconsistencies in the evidence.[16]

### 2.    The Retirement Funds of $121,334.70

Regarding the withdrawn retirement funds of $121,334.70, Glenn also claimed that there was no evidence or insufficient evidence to support the trial court's finding that he had wasted or committed fraud on the community. Vicki testified that Glenn had withdrawn $250,000.00 from the Southwest Securities retirement accounts. Of that amount, $50,000.00 was sent directly to the IRS.

Of the remaining $200,000.00, Glenn used $100,000.00 to purchase a

---

[14] *See Loaiza*, 130 S.W.3d at 901.

[15] *See Golden Eagle Archery, Inc.*, 116 S.W.3d at 761.

[16] *See McGalliard*, 722 S.W.2d at 697.

18

certificate of deposit (CD). The trial court admitted an exhibit showing that Glenn received a cashier's check of $101,334.70 for the matured CD. Glenn deposited the check into the ranch account, receiving $90,000.00 in cash. He testified at an earlier hearing that he paid $75,000.00 in cash to his sister. There is no evidence regarding the remaining $15,000.00. Vicki requested recoupment of the entire amount of the matured CD—$101,334.70.

Out of the other $100,000.00, Vicki testified that seven or eight days after Glenn requested a $50,000.00 distribution from Southwest Securities, he deposited $50,000.00 into an account at First State Bank. Glenn wrote some checks to himself and for ranch related expenses and incurred other miscellaneous debits totaling approximately $20,000.00.[17] Vicki sought recoupment of the $20,000.00. Glenn contends that the entire $20,000.00 was for the payment of ranch expenses.

Again, it was not Vicki's burden to prove that the expenditures were unfair, but, once she challenged them, Glenn's burden to prove that they were fair.[18] The trial court as the factfinder was the sole judge of the credibility of

---

[17] Petitioner's exhibit 81 reveals that the actual total amount withdrawn from the account—including checks and other debits—was $19,814.69. Given the size of the estate, the $185.31 discrepancy is immaterial.

[18] See *Loaiza*, 130 S.W.3d at 901.

the evidence[19] and could harmonize it.[20]

### 3. The $36,000.00 Cash from Ranch

With regard to the $36,000.00, Glenn contends that no evidence was admitted on this issue. Vicki testified as follows:

Q. And then there was $36,000.00 that Mr. Hancock paid from the First State Bank pursuant to — in his opinion, pursuant to a Court order; is that correct?

A. Yes.

Q. What is your recollection of the $36,000.00 that Mr. Hancock was to put into Hancock Insurance Agency?

A. Well, during court, Judge Haddock had asked if he had any other funds, any cash funds, anywhere. She said hidden under a rock or whatever. And he said yes, he did, he had $36,000.00 at the ranch in cash. And she had ordered him to deposit that money into the agency account the next morning — or by a certain — by 9:00 a.m., I believe.

Q. So instead of taking $36,000.00 in cash from his ranch, he went to the First State Bank and withdrew $36,000.00, correct?

A. Yes.

Q. And he deposited that into Hancock Insurance Agency?

A. Yes.

---

[19] ⌷ *See Golden Eagle Archery, Inc.*, 116 S.W.3d at 761.

[20] ⌷ *See McGalliard*, 722 S.W.2d at 697.

Q.    And that's 36,000 of retirement money, basically, right?

A.    Yes.

Q.    That's — the money from — from Southwest Securities went directly to First State Bank —

A.    Uh-huh.

Q.    [I]s that right?

A.    Yes.

Petitioner's Exhibit 81 shows that Glenn made a $36,000.00 withdrawal from his First State Bank account.  Vicki testified about it:

Q.    And is that the $36,000.00 . . . withdrawn by Mr. Hancock and deposited into Hancock Insurance Agency?

A.    Yes.

Q.    . . . . Do you believe that this was the $36,000.00 Mr. Hancock was referring to that he had in cash?

A.    No.

Q.    Why is that?

A.    Well, because he's writing a check on this account to deposit it.  That's not a cash deposit.

Vicki asked for a recoupment of the $36,000.00.  Glenn had the burden to prove that the disbursement of the $36,000.00 from the bank in lieu of the

$36,000.00 in cash that he, by his own admission, had at the ranch was fair,[21] and the trial court was the sole judge of the credibility of the evidence and the weight, if any, each item of evidence should have.[22]

Additionally, the trial court's file, which we presume the trial court judicially noticed,[23] shows that the trial court granted six different motions to compel discovery filed by Vicki. Among other things, the trial court specifically found that Glenn had violated agreed interim temporary orders dated August 27, 2004 by improperly cancelling Vicki's health insurance coverage, incurring indebtedness ($75,000.00) for purposes other than legal expenses when he borrowed money from his sister, and withdrawing $47,564.57 via cashier's check and paying off the entire balance of the debt on his 2004 Chevrolet motor vehicle. The trial court also found that Glenn violated temporary orders dated November 16, 2004 by failing to pay three months' spousal support to Vicki; by withdrawing all proceeds ($101,334.70) of a CD and misrepresenting or refusing to disclose to the trial court, or both, the existence, amount, or

---

[21] *See Loaiza*, 130 S.W.3d at 901.

[22] *See Golden Eagle Archery, Inc.*, 116 S.W.3d at 761; *see also McGalliard*, 722 S.W.2d at 697.

[23] *See* TEX. R. EVID. 201; *Barnard v. Barnard*, 133 S.W.3d 782, 786 (Tex. App.—Fort Worth 2004, pet. denied) ("[T]he trial court may take judicial notice of its file at any stage of proceedings and is presumed to have done so with or without a request from a party.").

location of the $101,334.70; by withdrawing $90,000.00 in cash from his checking account; by transferring the sum of $75,000.00 to his sister, and by withdrawing all proceeds ($56,845.96) of another CD.

Based on the above discussion, we hold that the trial court's findings that Glenn committed fraud on the community and wasted community assets in the total amount of $329,306.41 are supported by legally and factually sufficient evidence.

**D.    Benefits from Continuation of the Marriage, Disparity of Earning Power, Business Opportunities, Capabilities, and Abilities Supported By Evidence**

Also apparently as subissues to his contention that the division was unjust, Glenn contends that "absolutely no evidence" was admitted as to any of the benefits that Vicki would have derived from the continuation of the marriage and that "[t]he only evidence of the disparity of earning power, business opportunities, capabilities[,] and [the parties'] ability to support themselves was in favor of Vicki," that is, it portrayed Vicki as the person who was more financially capable.

In fact, the trial court heard evidence that

• the last time Vicki had gainful employment other than self-employment was approximately in 1976;

• she had been out of the job market for approximately thirty years;

• she had no current sources of income at the time of trial;

23

- she had zero net resources at the time of trial;

- she estimated that her health insurance would run $1,100.00–$1,500.00 per month and that her monthly living expenses would run $11,840.21;

- although she seemed somewhat knowledgeable and had some knowledge of the accounts, she was of limited assistance in discovering the history of and how the insurance agency works;

- Glenn is covered by Medicare;

- he started at least two other companies during the pendency of the divorce;

- he is a licensed insurance agent;

- he was the only employee of the insurance agency on the first day of trial and was primarily responsible for generating virtually all of the income of the business, except a very small amount of casualty insurance;

- the insurance agency had approximately twelve large accounts before receivership and only one as of the first day of trial;

- the diminution in value of the business since it entered receivership was indicative of Glenn's importance to the business.

Based on our review of the evidence before the trial court, who was the sole factfinder and judge of the credibility of the witnesses and who could resolve the inconsistencies in the evidence, we hold that the evidence was legally and factually sufficient to support the trial court's implicit finding that the above factors weighed in favor of giving Vicki a larger share of the community estate.

24

**E.     No Evidence of Glenn's Fault in the Breakup of the Marriage, But No Harm**

In his second issue, Glenn contends that the trial court erred by granting a disproportionate award of the marital estate on the basis of fault when the divorce was granted on the ground of insupportability.  In his third issue, Glenn contends that the trial court erred by awarding a disproportionate share of the marital estate when no evidence was admitted as to Glenn's fault. While we agree with Glenn that there is no evidence of Glenn's fault in the breakup of the marriage, the challenged finding of fact regarding fault actually states,

> 6.     Credible evidence was admitted to support the following factors *for consideration by the Court* in ordering a division of the parties' estate:
>
>> a.     GLENN's fault in the breakup of the marriage;
>>
>> b.     fraud on the community committed by GLENN;
>>
>> c.     benefits VICKI may have derived from the continuation of the marriage;
>>
>> d.     disparity of earning power of GLENN and VICKI and their ability to support themselves;
>>
>> e.     earning power, business opportunities, capacities, and abilities of both spouses; and
>>
>> f.     wasting of community assets by GLENN. [Emphasis added.]

The finding does not clearly state that the trial court considered fault as a factor.  Further, the associated conclusion of law provides, "Based on the

25

factors found by the Court, VICKI should receive a disproportionate share of the parties' community property." Because neither the finding nor the conclusion clearly and unambiguously provides that the trial court actually considered Glenn's fault in awarding the division of property, we do not make that leap, indulging, as we must, "every reasonable presumption in favor of the trial court's proper exercise of discretion in dividing marital property."[24]

Further, because the evidence otherwise supports the trial court's disproportionate division of property based on all the factors discussed above, we hold that the erroneous finding that there was evidence of fault is immaterial and harmless.[25] We therefore overrule Glenn's third issue. Because there was no evidence of fault, we do not reach his second issue.[26]

### F.    No Double Recovery by Vicki

In his fourth issue, Glenn contends that the trial court erred in dividing the marital estate by essentially granting Vicki a double recovery. A review of the trial court's findings of fact and conclusions of law shows that the trial court awarded the couple a 71/29% split of the existing community that would have been an approximately 59.5/40.5% split absent Glenn's fraud on the

---

[24] *Schaban-Maurer*, 238 S.W.3d at 820.

[25] *See* TEX. R. APP. P. 44.1(a); *Loaiza*, 130 S.W.3d at 904.

[26] *See* TEX. R. APP. P. 47.1.

community and waste and advances that they both received. The findings also show that the trial court relied on other factors besides waste and fraud in making the disproportionate division, such as benefits that Vicki may have derived from the continuation of the marriage, the disparity of earning power between Glenn and Vicki, and the earning power, business opportunities, capacities, and abilities of both spouses, all discussed above. Because the trial court's findings show that the trial court considered more than Glenn's fraud on the community and waste of the community assets in dividing the property, we cannot say that the trial court awarded Vicki a double recovery or abused its discretion. No independent money judgment was awarded here. Glenn's reliance in this regard on *Twyman v. Twyman*[27] and on our rejection of the wife's arguments seeking an additional judgment in *Loaiza*[28] is thus misplaced. We overrule Glenn's fourth issue.

**G.     Glenn Not Entitled to Fifty Percent of the Amount He Wasted**

In his fifth issue, Glenn contends that the trial court erred by granting Vicki a judgment for 100% of the alleged amount wasted by Glenn when she would only be entitled to an award of fifty percent of the amount allegedly wasted. The trial court did not award Vicki an additional judgment. Instead,

---

[27] 855 S.W.2d 619, 625 (Tex. 1993).

[28] 130 S.W.3d at 900.

27

the trial court awarded Vicki a disproportionate share of the community estate based on many factors, including Glenn's wasting of the community assets.

Additionally, we point out that contrary to Glenn's assertion that "half of those funds would have been [his] in any event," the trial court has no duty to divide a community estate, much less a specific asset, equally between the parties upon divorce.[29] We overrule Glenn's fifth issue.

### H. Division of Assets on Hand at the Time of Trial

In his sixth issue, Glenn contends that the trial court erred by dividing the community estate based on assets not on hand at the time of trial. The findings of fact given above show that the trial court divided the assets on hand. The trial court's explanation of how the assets wasted and disposed of through Glenn's fraud on the community impacted the ultimate division does not replace the actual division. We overrule Glenn's sixth issue.

### I. The Trial Court's Division of the Hancocks' Estate Not Unjust

Given the above discussion, we hold that Glenn has not demonstrated that the trial court abused its discretion in dividing the community estate. We overrule his first issue.

### V. Conclusion

---

[29] *See* TEX. FAM. CODE ANN. § 7.001 (Vernon 2006); *Osuna v. Quintana*, 993 S.W.2d 201, 209 (Tex. App.—Corpus Christi 1999, no pet.).

28

Having overruled Glenn's eight issues as well as his subissues, we affirm the trial court's judgment.

LEE ANN DAUPHINOT
JUSTICE

PANEL B:   LIVINGSTON, DAUPHINOT, and HOLMAN, JJ.

DELIVERED:  July 31, 2008